1
2
3
4
5
6
7

FILED

16 JUL 28 PM 1:03

CLERK, U.S. DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

BY:                    DEPUTY

8              UNITED STATES DISTRICT COURT

9              SOUTHERN DISTRICT OF CALIFORNIA

10

11   | JERRY DEWAYNE LORD,                    |   Case No.:  15cv669-BEN(KSC)

12   |                              Plaintiff,   |   **REPORT AND RECOMMENDA-**

13   | v.                                     |   **TION RE CROSS-MOTIONS FOR**
                                               **SUMMARY JUDGMENT**
14   | CAROLYN W. COLVIN, Acting              |
15   | Commissioner of Social Security,       |   **[Doc. Nos. 13 and 18]**
16   |                              Defendant.  |

17

18          Pursuant to Title 42, United States Code, Section 405(g), of the Social Security Act

19   ("SSA"), plaintiff filed a Complaint to obtain judicial review of a final decision by the

20   Commissioner of Social Security ("Commissioner") denying him disability and

21   supplemental security income benefits.  [Doc. No. 1.]  Pursuant to Title 28, United States

22   Code, Section 636(b)(1)(B), and Civil Local Rules 72.1(c)(1)(c) and 72.2(a), this matter

23   was assigned to the undersigned Magistrate Judge for a Report and Recommendation.

24          Presently before the Court are: (1) plaintiff's Motion for Summary Judgment [Doc.

25   No. 13]; (2) defendant's Cross-Motion for Summary Judgment [Doc. No. 18];

26   (3) plaintiff's Reply to defendant's Opposition [Doc. No. 20]; and (5) the Administrative

27   Record [Doc. No. 12].

28   ///

Plaintiff's Motion for Summary Judgment challenges the final decision of the Commissioner denying his application for disability and supplemental security income benefits, because the Administrative Law Judge ("ALJ") allegedly failed to properly evaluate the testimony of the medical expert who testified at his hearing. As a result, plaintiff contends that the ALJ erroneously concluded he retains the capacity to perform his past relevant work as a license or administrative clerk. [Doc. No. 13-1, at p. 2.] In addition, plaintiff challenges the ALJ's alternative finding that he could return to his past relevant work as a sedentary, skilled real estate clerk. According to plaintiff, the testifying vocational expert mischaracterized his work as a real estate clerk, so the ALJ's alternative conclusion is incorrect. [Doc. No. 13-1, at pp. 5-11.]

Defendant contends that the ALJ properly assessed plaintiff's residual functional capacity. In addition, defendant argues that the Court should affirm the ALJ's decision to deny benefits, because the ALJ's residual functional capacity assessment is supported by substantial evidence. [Doc. No. 18, at p. 3.] After careful consideration of the moving and opposing papers, as well as the Administrative Record and the applicable law, this Court RECOMMENDS that the District Court DENY plaintiff's Motion for Summary Judgment [Doc. No. 13] and GRANT defendant's Cross-Motion for Summary Judgment [Doc. No. 18].

## I.  *Background and Procedural History*.

On May 3, 2011, plaintiff submitted an application for disability insurance benefits indicating he became unable to work as of March 30, 2006. [Doc. No. 12-5, at p. 2; Doc. No. 12-5, at p. 5.] On September 20, 2011, plaintiff was notified that his application had been reviewed but he did not qualify for disability benefits because his health problems were not severe enough to prevent him from working. [Doc. No. 12-4, at pp. 2-6.] Plaintiff requested reconsideration of this decision on October 6, 2011. [Doc. No. 12-4, at pp. 7-12.] After reconsideration, the decision to deny benefits was affirmed on February 10, 2012. [Doc. No. 12-4, at pp. 8-12.] On March 16, 2012, plaintiff submitted additional evidence in support of his claim for benefits and requested a hearing before an

1 | ALJ. [Doc. No. 12-4, at pp. 15-16.] A hearing was held on April 16, 2013. [Doc. No.
2 | 12-4, at pp. 50-54.]

3 | On May 2, 2012, about one year after he submitted his application for disability
4 | insurance benefits, plaintiff submitted an application for supplemental security income
5 | benefits and stated his disability began on January 1, 2009. [Doc. No. 12-5, at p. 9.]

6 | On May 14, 2013, the ALJ concluded that plaintiff was not disabled within the
7 | meaning of the SSA and did not qualify for disability insurance benefits. The ALJ also
8 | concluded plaintiff did not qualify for supplemental security income benefits. [Doc. No.
9 | 12-2, at pp. 33-48.]

10 | Plaintiff requested review of the ALJ's decision by the Appeals Council. [Doc.
11 | No. 12-2, at pp. 8-9; 15-24.] On January 30, 2015, the Appeals Council denied review of
12 | the ALJ's May 14, 2013 decision. As a result, the ALJ's decision became the final
13 | decision of the Commissioner. [Doc. No. 12-2, at pp. 1-6.] The Complaint in this action
14 | was then filed on March 25, 2015. [Doc. No. 1.]

15 | **II.** **_Standards of Review._**

16 | Pursuant to Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary
17 | judgment if the movant shows that there is no genuine dispute as to any material fact and
18 | the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). "Summary
19 | judgment motions, as defined by Fed.R.Civ.P. 56, contemplate the use of evidentiary
20 | material in the form of affidavits, depositions, answers to interrogatories, and admissions.
21 | In Social Security appeals, however, the Court may 'look no further than the pleadings
22 | and the transcript of the record before the agency,' and may not admit additional
23 | evidence. _Morton v. Califano_, 481 F.Supp. 908, 914 n. 2 (E.D.Tenn.1978); 42 U.S.C.
24 | § 405(g). "[A]lthough summary judgment motions are customarily used [in social
25 | security cases], and even requested by the Court, such motions merely serve as vehicles
26 | for briefing the parties' positions, and are not a prerequisite to the Court's reaching a
27 | decision on the merits." _Kenney v. Heckler_, 577 F.Supp. 214, 216 (D.C. Ohio 1983).
28 | / / /

1    Title 42, United States Code, Section 405(g), provides as follows: "Any individual,
2    after any final decision of the Commissioner of Social Security made after a hearing to
3    which he was a party . . . may obtain a review of such decision by a civil action . . .
4    brought in the district court of the United States. . . .  The court shall have power to enter,
5    upon the pleadings and transcript of the record, a judgment affirming, modifying or
6    reversing the decision of the Commissioner of Social Security, with or without
7    remanding the cause for a rehearing. The findings of the Commissioner . . . as to any fact,
8    if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g).

9    **III.**  **_Evidence in the Administrative Record._**

10       **_A._**  **_Education, Work History, and Medical Information Included in Plaintiff's_**
11       **_Application and Related Forms._**

12   Plaintiff's application states that he was born on July 9, 1957. [Doc. No. 12-6, at
13   p. 2.] Therefore, at the time of the hearing before the ALJ on April 16, 2013, plaintiff
14   was 55 years old.  Plaintiff received his GED (*i.e.*, a high school equivalency certificate)
15   in May 1984 and also received training in basic office skills. [Doc. No. 12-6, at pp. 6, 9.]

16   Shortly after submitting his application, plaintiff included the following
17   information on a detailed Work History form dated May 23, 2011. [Doc. No. 12-6, at pp.
18   38-45.] As reflected therein, most recently, from November 2009 through April of 2010,
19   plaintiff worked as a clerk in a grocery store bagging groceries, greeting customers, and
20   retrieving shopping carts from the parking lot. [Doc. No. 12-6, at pp. 38-39.]  From May
21   2001 through March 2006, plaintiff worked as an office clerk in a real estate office doing
22   data entry, copying, mailing, and delivering paperwork to his supervisors. [Doc. No. 12-
23   6, at pp. 38, 40.]  From November 1996 through March 1999, plaintiff worked for the
24   California Department of Fish and Game.  His duties included data entry, filing licenses,
25   copying, and helping with packaging in the mailroom.  This job also involved lifting and
26   carrying file boxes. [Doc. No. 12-6, at pp. 38, 41.]

27   On May 23, 2011, plaintiff completed a Function Report form stating that he was
28   "very tired" as a result of a heart attack.  Plaintiff also stated he has difficulty handling

stress; high blood pressure; a herniated disk in his lower back; trouble hearing in one ear; serious headaches; depression; and anxiety. His daily activities included walking service dogs; doing "small chores" around his apartment, such as laundry and emptying the trash; watching television; browsing the internet; chatting with friends on the computer; and making simple meals. He cannot do heavy lifting and cannot sleep very long when his back hurts. Once a month, plaintiff shops for groceries. He does not drive because his license is suspended but he uses public transportation and goes shopping and to medical appointments with friends. Plaintiff also represented that he did not have a problem paying attention or following written instructions. However, he did report having trouble completing tasks and concentrating because of headaches. Plaintiff reported that his medical problems limited his ability to lift, bend, stand, walk, and climb stairs. He must rest for about ten minutes after walking two or three blocks. [Doc. No. 12-6, at pp. 21-28.]

Plaintiff's friend and housemate, Stephen Hernandez, also completed a Function Report on May 23, 2011. The responses by Mr. Hernandez are similar to responses on the above-referenced Function Report completed by plaintiff. However, Mr. Hernandez stated that the only household chore plaintiff is able to do is "dust" and it can take him over two hours because he needs to rest. Because of his back problems, Mr. Hernandez reported that plaintiff has trouble pushing a vacuum cleaner or standing for a long period of time. Mr. Hernandez also said plaintiff can be very irritable when he is in pain. [Doc. No. 12-6, at pp. 30-37.]

On May 25, 2011, when contacted by an SSA agent, plaintiff stated he had not seen a physician since 2005 because of "financial embarrassment" and "lack of insurance." [Doc. No. 12-6, at p. 46.] However, in a Disability Report submitted on March 15, 2012, plaintiff stated he was having ongoing appointments with Dr. David White for severe low back pain. [Doc. No. 12-6, at p. 69.]

On May 2, 2012, about one year after he submitted his application for disability insurance benefits, plaintiff submitted an application for supplemental security income

1   and stated his disability began on January 1, 2009. [Doc. No. 12-5, at p. 9.] In the

2   application, plaintiff represented that his only income was $200 in food stamps. He was

3   living with two non-relatives who paid the rent and other living expenses. At this time,

4   plaintiff also stated that he did not need help with personal care, hygiene, or upkeep of

5   the home. [Doc. No. 12-5, at pp. 10-12.]

6           In a Disability Report dated October 16, 2012, plaintiff reported that his medical

7   condition had worsened. At this time, plaintiff said he was taking medications for his

8   heart, high blood pressure, pain and headaches, and that the Vicodin he was taking for

9   pain and headaches was making him tired. [Doc. No. 12-6, at pp. 87-94.]

10          **B.      *Chronological Summary of Medical Records.***

11          On March 18, 2006, plaintiff had a cervical spine x-ray. The x-ray showed he had

12  "moderately advanced degenerative change mid-to-lower cervical spine" and "[a]dvanced

13  disk space narrowing C4 through C7 with associated osteophytes and probable foraminal

14  narrowing C5-6 and C6-7." [Doc. No. 12-7, at p. 123.]

15          Plaintiff went to the hospital on March 30, 2006 with chest pain and was admitted

16  for "presumed acute coronary ischemia" or reduced blood flow to the coronary arteries.

17  [Doc. No. 12-7, at pp. 13, 18-19.] Diagnostic cardiac catheterization was performed and

18  revealed "evidence of "triple vessel disease." [Doc. No. 12-7, at pp. 9, 11-12.]

19  Myocardial revascularization or bypass surgery was recommended. [Doc. No. 12-7, at p.

20  9.] The surgery was performed on April 1, 2006. A Discharge Summary states that

21  plaintiff "received coronary artery bypass graft x4." [Doc. No. 12-7, at p. 2.] Plaintiff

22  was released from the hospital on April 5, 2006. [Doc. No. 12-7, at pp. 2-7.]

23          A post-surgical cardiology examination was completed on April 27, 2006.

24  Plaintiff had a treadmill test and the results were "negative for any evidence of ischemia

25  or arrhythmias." [Doc. No. 12-7, at p. 72.] Additional follow-up notes from 2006

26  indicate plaintiff "had no complications recovering from his surgery." [Doc. No. 12-2, at

27  p. 42; Doc. No. 12-7, at pp. 55-59, 64-65.] However, he did complain of neck and back

28  pain and was referred to physical therapy. [Doc. No. 12-7, at pp. 70-71.]

1    As noted above, plaintiff filed his application for disability insurance benefits on

2  May 3, 2011.  At the request of the Department of Social Services, Disability Evaluation

3  Department, plaintiff was examined by Dr. Noli A. Cava, an internist, on August 13,

4  2011.  [Doc. No. 12-7, at pp. 86-88.]  Plaintiff told Dr. Cava he could not work because

5  of a herniated or "worn disc in his lower back" that causes low back pain with occasional

6  radiation down to his left calf.  Although he said he was offered surgery, plaintiff said he

7  refused and elected to manage the problem with physical therapy and medication.  In

8  addition, plaintiff reported to Dr. Cava that he had bypass surgery and still gets

9  intermittent shortness of breath, has a history of high blood pressure that is controlled

10  with medication, anxiety, depression, deafness in his right ear since birth, headaches, and

11  fatigue.  [Doc. No. 12-7, at p. 86.]

12    In his evaluation, Dr. Cava noted that plaintiff could still walk several blocks

13  before he needed to rest, had a normal range of motion, and did not have any problems

14  with squatting, kneeling, or crouching.  [Doc. No. 12-7, at pp. 86-88.]  Based on his

15  examination, Dr. Cava concluded that plaintiff could stand, walk, and sit for six hours in

16  an eight-hour day; lift and carry 25 pounds frequently and 50 pounds occasionally; and

17  had no limitations for stooping, crouching, reaching, and handling.  Dr. Cava confirmed

18  that plaintiff is deaf in his right ear but had no visual limitations.  [Doc. No. 12-7, at p.

19  88.]

20    On June 24, 2011, plaintiff had an initial visit with Lindsey C. Yung, a nurse

21  practitioner ["NP Yung"] at Linda Vista San Diego Family Care.[1]  [Doc. No. 12-7, at pp.

22  144, 130.]  He was seeking a refill for his blood pressure medication and said he had last

23  seen a cardiologist in 2007.  He also said he had shortness of breath and "very mild"

_____

[1]    SSA regulations list "nurse practitioners" as examples of a number of "acceptable
medical sources."  20 CFR 404.1513(d)(1).  The ALJ must evaluate each medical opinion
received "[r]egardless of its source."  20 CFR 404.1527(c).  The opinions of treating and
examining medical sources are afforded "more weight" than non-treating, non-examining
sources.  20 CFR § 404.1527(c)&(e).

1   chest pain that lasts less than a minute.  In addition, he told NP Yung that his lower back

2   pain was getting worse and the pain sometimes radiates down his left leg.  He was taking

3   over-the-counter pain medications.  [Doc. No. 12-7, at pp. 144-145.]  NP Yung

4   prescribed medication to treat plaintiff's hypertension (Lisinopril and aspirin) and acid

5   reflux (Prilosec).  NP Yung also prescribed pain medication to treat plaintiff's low back

6   pain (Tramadol) and a muscle relaxant to address muscle spasms (Cyclobenzaprine).

7   [Doc. No. 12-7, at p. 145.]

8        On July 19, 2011, plaintiff had an appointment with NP Yung for "fasting labs."

9   [Doc. No. 12-7, at p. 140.]  Plaintiff told NP Yung that Tramadol was helping his lower

10  back pain but he was still having shooting pains into his legs and some numbness and

11  tingling.  [Doc. No. 12-7, at p. 140.]  NP Yung noted that an x-ray showed degeneration,

12  osteophytes, and disc narrowing.  Prescriptions for pain medications were continued and

13  an MRI of plaintiff's spine was requested.  [Doc. No. 12-7, at pp. 142-143.]

14       Plaintiff had a follow-up appointment with NP Yung on August 15, 2011 about his

15  "[l]ab results."  [Doc. No. 12-7, at p. 137.]  NP Yung's notes indicate plaintiff was being

16  treated for hypertension, back pain, and elevated cholesterol.  His heart rate was "mildly

17  elevated" and his blood "platelet count" was "a little low."  [Doc. No. 12-7, at pp. 137-

18  138.]  For plaintiff's back pain, NP Yung discontinued plaintiff's prescriptions for

19  Tramadol and Cyclobenzaprine and replaced it with Naprosyn.  [Doc. No. 12-7, at p.

20  139.]

21       At the request of the Department of Social Services, Dr. Jaga Nath Glassman, a

22  psychiatrist, interviewed plaintiff on August 24, 2011 and prepared a written psychiatric

23  evaluation.  [Doc. No. 12-7, at pp. 91-94.]  Based on the August 24, 2011 interview,

24  Dr. Glassman reported there were "no signs of depression or anxiety"; plaintiff

25  "ambulated without apparent difficulties;" and plaintiff "sat throughout the examination

26  without apparent discomfort." [Doc. No. 12-7, at p. 93.]  Dr. Glassman concluded there

27  was "no evidence of impairment on a psychiatric basis."  [Doc. No. 12-7, at p. 94.]

28  Plaintiff's mental status examination was "completely without abnormality."  [Doc. No.

12-7, at p. 93.]  In addition, plaintiff told Dr. Glassman "he could work at a job at a desk if he were able to move around and shift position." [Doc. No. 12-7, at p. 93.]

A report by Dr. Lori L. Baker dated August 30, 2011 states than an MRI of the lumbar spine was completed based on plaintiff's complaints of chronic low back pain. [Doc. No. 12-7, at p. 121.]  The report notes there is a "3 mm posterior osteophyte/disc complex at L5-S1 which mildly impinges upon the S1 nerve roots bilaterally." [Doc. No. 12-7, at p. 121.  In addition, the reports states that there are "[m]ild disc bulges at remaining levels . . . with no associated nerve root impingement." [Doc. No. 12-7, at p. 122.]

Progress Notes from an appointment with NP Yung on October 14, 2011 state that plaintiff complained of back pain which is not relieved with Naprosyn, daily headaches, dizziness, memory loss, and numbness where the vein was taken from his leg for his heart surgery.  He also said his left knee has been "giving out" and has caused "difficulty with gait for the last couple months." [Doc. No. 12-7, at p. 133.]  NP Yung noted that plaintiff would be seen by neurology in December and that a "pain clinic referral is pending." [Doc. No. 12-7, at pp. 133-134.]  An x-ray of plaintiff's left knee and a CT scan of plaintiff's head were ordered.  NP Yung prescribed Vicodin for back pain and also continued a prescription for Naprosyn.  [Doc. No. 12-7, at pp. 133-134.]

A CT scan of plaintiff's head was performed by Dr. Gregg Anderson on October 25, 2011 based on plaintiff's complaints of headache and memory loss.  [Doc. No. 12-7, at pp. 120, 130.]  However, there were "[n]o acute findings." [Doc. No. 12-7, at p. 120.]

NP Yung's medical notes from an appointment on December 16, 2011 state that an x-ray of plaintiff's left knee was "completely normal," but he continued to complain of numbness in his lower leg that began after a vein was taken during his heart bypass surgery.  [Doc. No. 12-7, at p. 130.]  He complained of chronic headaches and had been referred to neurology but a CT scan of the head showed "no acute findings." [Doc. No. 12-7, at p. 130.]  To treat lower back pain, plaintiff had been taking Vicodin, but he said

1  he stopped taking it because "it made him feel in a daze." [Doc. No. 12-7, at p. 130.]

2  According to plaintiff, he had previously consulted with a neurosurgeon about his back

3  pain but was told that surgery would only cause more pain. [Doc. No. 12-7, at pp. 130-

4  131.] NP Yung requested a consultation with a neurosurgeon, because plaintiff wanted a

5  second opinion. Plaintiff was referred to the pain clinic and physical therapy. His blood

6  pressure medication and prescriptions for pain medications, Tramadol and Naprosyn,

7  were continued, but NP Yung discontinued the prescription for Vicodin. [Doc. No. 12-7,

8  at pp. 130-131.]

9       On December 23, 2011, plaintiff returned to NP Yung for a "potassium recheck

10  and EKG after potassium returned mildly elevated." [Doc. No. 12-7, at p. 125.]

11  Although there were "[n]o acute findings," the Electrocardiogram or EKG was "non-

12  specifically abnormal." [Doc. No. 12-7, at p. 125.] Based on the abnormal findings and

13  plaintiff's history of "quadruple bypass," it was recommended that plaintiff establish care

14  with a specialist in cardiology, Dr. Tri Nguyen. [Doc. No. 12-7, at p. 125.]

15       On January 25, 2012, a medical consultant, K. Vu, prepared a Physical Residual

16  Functional Capacity Assessment form based on the evidence in plaintiff's file. [Doc. No.

17  12-7, at pp. 172-176.] The form states that plaintiff is able to lift and carry 20 pounds

18  occasionally and 10 pounds frequently; stand, walk, and sit with normal breaks for 6

19  hours in an 8-hour workday; and climb, stoop, kneel, crouch and crawl occasionally.

20  [Doc. No. 12-7, at pp. 172-176.] The only limitation included on the form is that plaintiff

21  could not do work requiring acute hearing in his right ear. [Doc. No. 12-7, at p. 175.]

22       The same medical consultant, K. Vu, also prepared a Case Analysis on January 25,

23  2012. Based on the evidence in the file, the Case Analysis states that "fully disabling

24  severity [was] not established by objective findings" and "[t[he severity of the

25  impairments in the allegations [was] disproportionate to the objective findings." [Doc.

26  No. 12-7, at pp. 177-178.]

27       Plaintiff had another EKG in the offices of Dr. Tri T. Nguyen on January 27, 2012.

28  [Doc. No. 12-7, at pp. 184-187.] Dr. Nguyen also prepared a detailed report of his

1   evaluation of plaintiff in a letter dated March 31, 2012. [Doc. No. 12-7, at pp. 182-183.]

2   Dr. Nguyen's examination of plaintiff included the results of several tests:  (1) The

3   electrocardiogram (EKG) "showed normal sinus rhythm and no significant abnormality."

4   [Doc. No. 12-7, at p. 183.]  (2) An exercise treadmill test showed that plaintiff had

5   "normal exercise tolerance." [Doc. No. 12-7, at p. 183.]  During the treadmill test,

6   plaintiff had no significant chest pain but did have pain in his right calf. (3) "A Holter

7   recording showed occasional premature atrial contractions and premature ventricular

8   contractions, otherwise unremarkable." [Doc. No. 12-7, at p. 183.]  (4) A "Carotid

9   Doppler study showed mild plaques only.  No significant common carotid artery or

10  internal carotid artery narrowing was present.  The vertebral arterial flow was normal

11  bilaterally." [Doc. No. 12-7, at p. 183.]  Dr. Nguyen's report concluded that plaintiff was

12  "doing well from a cardiac standpoint." [Doc. No. 12-7, at p. 183.]

13      At an appointment with NP Yung on July 24, 2012, plaintiff complained of chronic

14  headaches, fatigue, and spasms in his calves.  He said he could not walk very far without

15  getting "very winded." [Doc. No. 12-7, at p. 222.]  NP Yung prescribed an inhaler and

16  ordered testing to determine if plaintiff's complaints of fatigue were related to heart

17  function. [Doc. No. 12-7, at p. 223.]

18      On August 6, 2012, plaintiff met with a therapist for an "intake evaluation" and

19  reported anxiety, panic attacks, low energy, restlessness, excessive worry, compulsive

20  behaviors, depression, and sleep issues.  A year before the appointment, plaintiff lost a

21  partner of 25 years and had been living with another couple.  He reported medical issues

22  that made it difficult for him to work and said he must depend on friends for money and a

23  place to live.  Continued therapy was recommended. [Doc. No. 12-7, at pp. 219-220.]

24      On October 26, 2012, plaintiff had an appointment with NP Yung and reported he

25  had been to see a neurosurgeon, who told him that his back pain was "secondary to old

26  age and that his only option [was physical therapy] and injections." [Doc. No. 12-7, at p.

27  216.]  He had also been referred to neurology for a CT scan of his head but said he forgot

28  to call for the appointment. [Doc. No. 12-7, at p. 216.]  Medications were continued for

1  hypertension, back pain, muscle spasms, and elevated cholesterol.  There was a lesion on

2  plaintiff's lower left cheek that would not heal, so he was referred to dermatology.  [Doc.

3  No. 12-7, at pp. 216-217.]

4  　　　During a follow-up appointment on November 27, 2012 with NP Yung, plaintiff

5  had "[n]o new complaints" but said he was awaiting results of a biopsy of an un-healing

6  lesion on his left cheek.  He also requested a cane to aid with ambulation, because he has

7  back pain and has "had some 'almost' falls."  [Doc. No. 12-7, at pp. 212, 214.]

8  Medications were continued to address back pain, hypertension, and elevated cholesterol.

9  [Doc. No. 12-7, at pp. 213-214.]

10  　　　On December 14, 2012, plaintiff had an initial evaluation for physical therapy at

11  Sharp Healthcare to address his lower back pain, and he was placed on a home treatment

12  plan.  [Doc. No. 12-7, at pp. 191-193.]  He was walking 10 to 15 minutes every 2 hours

13  but complained of cramping in his calves, burning on the bottom of his feet, and pain in

14  his neck.  He told the therapist he was not working because of lower back pain and

15  headaches.  [Doc. No. 12-7, at pp. 190-191.]  His prescription for Naprosyn was

16  "helpful."  [Doc. No. 12-7, at p. 191.]

17  　　　On January 9, 2013, plaintiff was discharged from physical therapy at Sharp

18  Healthcare because his functional goals had been achieved.  His strength and pain had

19  improved, and he was able to walk for 30 minutes without difficulty.  However, plaintiff

20  continued to report fatigue and calf cramping with prolonged walking, so further medical

21  evaluation was recommended.  [Doc. No. 12-7, at p. 190.]

22  　　　On January 16, 2013, plaintiff had a follow up appointment with NP Yung, who

23  reported in his Progress Notes that the lesion on plaintiff's cheek "turned out to be basal

24  cell carcinoma," so he was awaiting approval from his insurance to begin radiation

25  treatment.  [Doc. No. 12-7, at p. 209.]  Medications were continued for hypertension,

26  back pain, and depression.  [Doc. No. 12-7, at p. 210.]

27  　　　Plaintiff had a neurology consultation with Dr. Geoffrey Lyle Sheean at UC San

28  Diego Healthcare System on February 5, 2013.  Testing completed during the

consultation included an EMG (Electromyography). The interpretation section of the test results state as follows: "The study is ABNORMAL. 1. There is chronic axonal loss affecting the left L4-S1 myotomes, especially L5, almost certainly due to chronic radiculopathy. There is no evidence of recent or ongoing axonal injury. A limited study suggests similar, probably less severe, pathology on the right. 2. There is no evidence of large sensory fiber polyneuropathy in the feet." [Doc. No. 12-7, at pp. 196-197.] In addition, the consultation report includes the following differential diagnosis: "1. L/S radiculopathy and neurogenic claudication (spinal stenosis?); 2. Polyneuropathy, incl. small fibres." [Doc. No. 12-7, at pp. 194-206.]

Progress notes from a follow-up appointment with NP Yung on February 27, 2013 state that plaintiff was having neck pain and some nerve studies had been ordered. His lower back pain was "well-controlled with Vicodin." [Doc. No. 12-7, at p. 207.] Although he had been referred to the pain clinic, plaintiff said he had not been contacted for an appointment and did not want to go because "his pain is controlled with oral medications." [Doc. No. 12-7, at p. 207.] Medications were continued for hypertension, elevated cholesterol, depression, and pain. [Doc. No. 12-7, at p. 208.] Plaintiff reported that he started radiation therapy for basal cell carcinoma on his left cheek near his jawline. [Doc. No. 12-7, at p. 207.] A letter dated March 18, 2013 from Genesis Healthcare states that plaintiff completed radiation therapy. [Doc. No. 12-7, at p. 248.]

C.  *Hearing Testimony.*

1.  *Plaintiff.*

When questioned at the hearing by the ALJ, plaintiff testified that he was not presently working and had not worked since 2009. In 2009, he worked for six months as a greeter in a grocery store. [Doc. No. 12-2, at pp. 58-59.] Prior to that, he worked as an office clerk for over five years and as a clerk in the back office at the Department of Fish and Game. [Doc. No. 12-2, at p. 59.] He decided to quit the job as greeter in the grocery store because standing for eight hours was making his back stiff and sore. After that, he did not look for other work. [Doc. No. 12-2, at p. 60.]

1    Plaintiff appeared at the hearing using a cane that was prescribed by "Dr. Michelle

2    Young."[2]  He had been using the cane off and on for about two months.  The cane was

3    prescribed in February 2013. [Doc. No. 12-2, at p. 65.]  When asked what had changed

4    to prompt him to return to the doctor since "last summer," plaintiff explained that he

5    started having neck pain and his back pain was moving from side to side.  At the time of

6    the hearing, plaintiff said his back pain was "just hurting all the way across." [Doc. No.

7    12-2, at p. 66.]  In addition, he has noticed more calf pain in both calves while walking

8    less than a half of a block. [Doc. No. 12-2, at p. 68.]

9        Plaintiff further testified that he gets "very stiff and sore" when sitting for 10 to 30

10   minutes while watching a television program, and he then has to get up and move around

11   for 10 minutes before he can sit down again. [Doc. No. 12-2, at p. 70.]  On the morning

12   of the hearing, plaintiff did not take any pain medication.  However, he takes Vicodin

13   every day in the morning for pain.  Previously, he took Vicodin every 6 hours for pain,

14   but he cut back.  The reason he takes the Vicodin in the morning is that he is "really stiff

15   and sore" first thing in the morning and the Vicodin helps him to get moving for the day.

16   [Doc. No. 12-2, at pp. 71-72.]  Later in the day he takes aspirin or Excedrin but it

17   provides "very little" pain relief.  The Excedrin does help with his headaches. [Doc. No.

18   12-2, at p. 72.]

19       When questioned by his attorney during the hearing, plaintiff testified that his neck

20   pain radiates down his right arm to his elbow and his middle finger.  His whole arm "goes

21   numb." [Doc. No. 12-2, at p. 73.]  He has a headache every morning that lasts all day.

22   The Excedrin helps but he does not get complete relief from the headaches.  As a result,

23

24   _____

25   [2]     The physician's name appears to be a stenographic error.  As noted above in the
26   chronological summary of plaintiff's medical records, plaintiff received his primary
     medical care through Lindsey C. Yung, a nurse practitioner. [Doc. No. 12-7, pp. 144 *et*
27   *seq.*]  Plaintiff's medical records indicate that he requested a cane to aid ambulation
     during his appointment with NP Yung on November 27, 2012. [Doc. No. 12-7, at pp.
28   212, 214.]  The Court was unable to locate any medical notes from a Dr. Michelle Young.

15cv669-BEN(KSC)

his doctor suggested a neurology consult. [Doc. No. 12-2, at p. 73.] His low back pain also radiates down both legs but mostly on the left side. [Doc. No. 12-2, at p. 74.] The Vicodin makes him "groggy." [Doc. No. 12-2, at p. 75.] He can stand for about 10 or 15 minutes before he has to sit down and can only lift 5 to 10 pounds. [Doc. No. 12-2, at pp. 75-76.] After walking a half a block, plaintiff feels exhausted and out of breath. [Doc. No. 12-2, at p. 76.] He no longer drives because of the medications and because his license was suspended some time ago because of drunk driving. [Doc. No. 12-2, at pp. 77-78.]

Plaintiff also testified he lives with two roommates. One of the roommates does the cooking and the laundry. He tries to pick things up around the house and do vacuuming but must take frequent breaks to rest. They all help with grocery shopping. However, the third roommate is older and does not do much. They have three service dogs that need to be taken outside every two hours, so that keeps plaintiff going. [Doc. No. 12-2, at pp. 79-80.] The dogs help to keep them calm. Plaintiff has a fear of crowds and close environments. They take the dogs wherever they go. [Doc. No. 12-2, at pp. 80-81.]

## 2. *Medical Expert.*

Dr. Pella, a medical expert, testified that plaintiff's medical records show the following: (1) Plaintiff had a heart attack in 2006 and then had "coronary artery bypass grafting" in "four vessels." [Doc. No. 12-2, at p. 61.] However, Dr. Pella said, "Recent studies have shown adequate function. . . ." [Doc. No. 12-2, at p. 61.] Testing indicated he was capable of light activity. [Doc. No. 12-2, at pp. 61, 63.] (2) Plaintiff has a long standing history of low back pain "with more recent exacerbation" that prompted an MRI in August 2011. "He was found to have mild to moderate bulging primarily degenerative disc disease that has worsened. . . ." [Doc. No. 12-2, at p. 62.] There was also some evidence of nerve compression (radiculopathy). [Doc. No. 12-2, at p. 62.] (3) Plaintiff is congenitally deaf in his left ear. [Doc. No. 12-2, at p. 62.] (4) Plaintiff has systemic hypertension without organ damage. (5) Plaintiff is taking medication for migraine

1  headaches.  (6) Plaintiff had knee surgery on his right leg.  (7)  There are some

2  indications in the record indicating plaintiff has had some issues with anxiety, depression,

3  and prior drug and alcohol use but these are outside Dr. Pella's area of expertise.  [Doc.

4  No. 12-2, at p. 62.]

5       Based on the records he reviewed, Dr. Pella testified it was his opinion that

6  plaintiff's impairments, whether viewed separately or in combination, did not met or

7  equal the severity of any of the listed impairments in the Social Security regulations.

8  [Doc. No. 12-2, at p. 62.]  Based on plaintiff's cardiac history alone, which indicates he

9  had "adequate function" following his bypass surgery, Dr. Pella said plaintiff was

10  "capable of light exertion." [Doc. No. 12-2, at pp. 61-63.]  With the combination of his

11  cardiac condition, back issues, and postural limitations, Dr. Pella believes plaintiff's

12  activity level was reduced to sedentary as of August 2011.  At this time, plaintiff's back

13  pain was severe enough to warrant imaging studies, and an MRI indicated there was mild

14  bilateral impingement of nerve roots.  [Doc. No. 12-2, at pp. 63-64.]  Although this was

15  "too mild a finding" to equal a Listing, Dr. Pella said plaintiff was "close to a listing in

16  February 2013" after additional findings were made based on the results of EMG testing.

17  [Doc. No. 12-2, at p. 64.]

18       *3.   **Vocational Expert.**

19       The vocational expert testified that plaintiff's former job as a license clerk with the

20  Department of Fish and Game is considered semi-skilled, light work.  [Doc. No. 12-2, at

21  p. 82.]  The job of grocery clerk/greeter is unskilled, medium work, and the job of real

22  estate clerk is sedentary work.  [Doc. No. 12-2, at p. 83.]  Plaintiff's past relevant work as

23  a license/administrative clerk and a real estate clerk would be appropriate for someone of

24  plaintiff's age, education, work experience, and limitations who is capable of a "light

25  level of exertion." [Doc. No. 12-2, at p. 83.]  Plaintiff's past relevant work as a real

26  estate clerk would also be appropriate for someone with plaintiff's age, education, work

27  experience, and limitations who is capable of a "sedentary level of exertion." [Doc. No.

28  12-2, at p. 84.]  Plaintiff's past relevant work would be ruled out if additional conditions

1  and limitations are imposed, including frequent stand and sit option; frequent balance;

2  "occasional for the remaining posturals;" no work requiring acute hearing in the right ear;

3  no concentrated exposure to certain environments; and ability to understand, remember,

4  perform simple work instructions and tasks.  There would still be unskilled work

5  available at a sedentary level for such an individual with transferable skills.  However,

6  without transferable skills, an individual would "GRID rule at age 50."  [Doc. No. 12-2,

7  at p. 85.]

8  **IV.**    ***The ALJ's Five-Step Disability Analysis.***

9        To qualify for disability benefits under the SSA, an applicant must show that he or

10  she is unable to engage in any substantial gainful activity because of a medically

11  determinable physical or mental impairment that has lasted or can be expected to last at

12  least 12 months.  42 U.S.C. § 423(d).  The Social Security regulations establish a five-

13  step sequential evaluation for determining whether an applicant is disabled under this

14  standard.  20 CFR § 404.1520(a); *Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

15        At step one, the ALJ must determine whether the applicant is engaged in

16  substantial gainful activity.  20 CFR § 404.1520(a)(4)(I).  "Substantial gainful activity is

17  work activity that is both substantial and gainful."  20 CFR § 416.972.  Here, the ALJ

18  concluded plaintiff had not engaged in substantial gainful activity since March 30, 2006

19  (*i.e.*, the date plaintiff claims he became disabled).  [Doc. No. 10-2, at pp. 25-26.]

20        At step two, the ALJ must determine whether the applicant is suffering from a

21  "severe" impairment within the meaning of Social Security regulations.  20 CFR

22  § 404.1520(a)(4)(ii).  "An impairment or combination of impairments is not severe if it

23  does not significantly limit [the applicant's] physical or mental ability to do basic work

24  activities."  20 CFR § 404.1521(a).  For example, a slight abnormality or combination of

25  slight abnormalities that only have a minimal effect on the applicant's ability to perform

26  basic work activities will not be considered a "severe" impairment.  *Webb v. Barnhart*,

27  433 F.3d 683, 686 (9th Cir. 2005).  Examples of basic work activities include walking,

28  standing, sitting, lifting, pushing, pulling, reaching, carrying, handling, seeing, hearing,

speaking, understanding, carrying out and remembering simple instructions, use of judgment, responding appropriately to supervision, co-workers and usual work situations, and dealing with changes in a routine work setting. 20 CFR § 404.1521(b)(1)-(6). "If the ALJ finds that the claimant lacks a medically severe impairment, the ALJ must find the claimant not to be disabled." *Webb v. Barnhart*, 433 F.3d at 686.

At step two, the ALJ concluded plaintiff has the severe impairments of "coronary artery disease, status post bypass grafts; [and] degenerative disc disease of the cervical spine and the lumbar spine." [Doc. No. 12-2, at p. 39.] These impairments are severe because they "significantly limit his physical ability to do basic work activities." [Doc. No. 12-2, at p. 41.] Based on the record, the ALJ also concluded plaintiff does not have any mental or psychiatric impairments that are severe enough to impact his ability to work. [Doc. No. 12-2, at pp. 39-41.]

If there is a severe impairment, the ALJ must then determine at step three whether it meets or equals one of the "Listing of Impairments" in the Social Security regulations. 20 CFR § 404.1520(a)(4)(iii). If the applicant's impairment meets or equals a Listing, he or she must be found disabled. *Id.* In this case, the ALJ concluded at step three that plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. [Doc. No. 12-2, at p. 41.] Specifically, the ALJ concluded based on the medical evidence in the record that plaintiff's degenerative disc disease and ischemic heart disease are not severe enough to meet a Listing. [Doc. No. 12-2, at p. 41.]

If an impairment does not meet or equal a Listing, the ALJ must make a step four determination of the claimant's residual functional capacity based on all impairments, including impairments that are not severe. 20 CFR § 404.1520(e), § 404.1545(a)(2). "Residual functional capacity" is "the most [a claimant] can still do despite [his or her] limitations." 20 CFR § 404.1545(a)(1). The ALJ must determine whether the applicant retains the residual functional capacity to perform his or her past relevant work. 20 CFR § 404.1520(a)(4)(iv).

Here, plaintiff objects to the ALJ's findings at step four. At step four, the ALJ concluded plaintiff has the residual functional capacity to perform his past relevant work as a license clerk and/or administrative/real estate clerk.[3] According to the ALJ, these positions are considered light, semi-skilled work that plaintiff is able to do despite his heart and back conditions. With respect to plaintiff's back condition, the ALJ found that plaintiff's "allegations of disabling pain are out of proportion with the record." [Doc. No. 12-2, at p. 45.] The ALJ also rejected a portion of the opinion of the testifying medical expert, Dr. Pella, that plaintiff's functional capacity "decreased to sedentary in August 2011 due to a lumbar radiculopathy." [Doc. No. 12-2, at p. 46.] Plaintiff now challenges the ALJ's reasons for rejecting this portion of Dr. Pella's opinion testimony. [Doc. No. 13-1, at pp. 6-9.] According to plaintiff, the ALJ committed legal error by failing to articulate good reasons for not fully crediting the opinion testimony of Dr. Pella. [Doc. No. 20, at pp. 4, 8.]

Alternatively, the ALJ concluded plaintiff would not be disabled even if full credit was given to Dr. Pella's opinion that his functional capacity "decreased to sedentary in August 2011 due to a lumbar radiculopathy." [Doc. No. 12-2, at p. 46.] The ALJ

---

[3] Since the ALJ concluded plaintiff has the residual functional capacity to perform past relevant work, it was unnecessary for the ALJ to complete step five of the disability analysis. If the applicant cannot perform past relevant work, the ALJ–at step five–must consider whether the applicant can perform any other work that exists in the national economy. 20 CFR § 404.1520(a)(4)(v). While the applicant carries the burden of proving eligibility at steps one through four, the burden at step five rests on the agency. *Celaya v. Halter*, 332 F.3d 1177, 1180 (9th Cir. 2003). The ALJ must consider all of plaintiff's medically determinable impairments, including any pain that could "cause a limitation of function" and any impairments that were not "severe," and then determine plaintiff's residual functional capacity to perform other work in the national economy. 20 CFR §§ 404.1520; 404.1545; 416.929. "In determining [the claimant's] residual functional capacity, the ALJ must consider whether the aggregate of [the claimant's] mental and physical impairments may so incapacitate him that he is unable to perform available work." *Light v. Soc. Sec. Admin.*, 119 F.3d 789, 793 (9th Cir. 1997). As noted above, "residual functional capacity" is "the most [an applicant] can still do despite [his or her] limitations." 20 CFR § 404.1545(a)(1).

reasoned that plaintiff could still return to his past relevant work as a real estate clerk, which is classified as sedentary, skilled work. [Doc. No. 12-2, at p. 47.] However, citing the Dictionary of Occupation Titles ("DOT"), plaintiff contends that the testifying vocational expert mischaracterized his prior work as a real estate clerk. According to plaintiff, this position could not be characterized as a sedentary, skilled position. Instead, plaintiff states that he worked as a generic office clerk in a real estate office, which could only be characterized as a semi-skilled position requiring light exertion. [Doc. No. 13-1, at pp. 4-5.]

Since he contends that he does not have any past relevant work at a sedentary, skilled level, plaintiff believes the ALJ's alternative conclusion is incorrect. According to plaintiff, if Dr. Pella's opinion was fully credited, the ALJ would have been obligated to conclude he was not able to perform any of his past relevant work. [Doc. No. 13-1, at pp. 5-6.] Citing Medical-Vocational Guideline Rule 201.14, 20 CFR, Part 404, Subpart P, Appendix 2 (the "grid rule"), it is plaintiff's view that he would only be able to perform sedentary work if he has transferable skills. If he does not have transferable skills, plaintiff believes he would be considered disabled under the "grid rule."[4] [Doc. No. 13-1, at p. 11.]

Plaintiff's view is that there is no evidence in the record to show whether he has transferable skills to perform other sedentary work. Because he contends his past relevant work "falls on the low end of the semi-skilled range of work," plaintiff believes he does not have transferable skills, particularly because he attained the age of 55 on July 9, 2012 while his claim for benefits was pending. As a result, plaintiff argues that the Court should reverse the SSA's decision and award benefits or remand the matter for further administrative proceedings. [Doc. No. 13-1, at pp. 3-11.]

---

[4] Section 201.14 indicates that an individual closely approaching advanced age with the residual functional capacity for sedentary work would be considered disabled if he or she had a high school education but no transferable skills. 20 CFR, Part 404, Subpart P, Appendix 2.

1    *V.    Discussion.*

2          *A.    The ALJ's Rejection of a Portion of Dr. Pella's Opinion.*

3          Plaintiff argues that the ALJ provided insufficient reasons for rejecting the portion

4    of Dr. Pella's testimony that indicates his residual functional capacity was reduced from

5    the "light" work category to the "sedentary" work category as of August 2011. [Doc. No.

6    13-1, at pp. 6-9.]  The ALJ's decision discusses his rejection of this portion of Dr. Pella's

7    opinion in a single paragraph which states as follows:

8              [P]artial weight is given to impartial medical expert, John Pella, M.D.,
         who indicated the claimant's coronary artery disease limited him to light
9        exertion, and that his condition decreased to sedentary in August 2011 due to
         a lumber radiculopathy.  ***While the claimant does have radicular pain, he***
10       ***has never demonstrated motor or sensory abnormalities.  As noted above,***
         ***his admitted activities are greater than sedentary.***  Dr. Pella also opined
11       that from his 2006 bypass to August 2011, the claimant was able to lift and
         carry 10 pounds frequently and 20 pounds occasionally; he could stand and
12       walk up to 6 hours out of an 8-hour day and he could sit up to 6 hours out of
         an 8-hour day.  Consequently, the undersigned accepts the opinion that the
13       claimant has been limited to light work since 2006, but not the opinion that
         the claimant's function has reduced further to sedentary.
14

15

16

17   [Doc. No. 12-2, at p. 46.]

18          "Light work involves lifting no more than 20 pounds at a time with frequent lifting

19   or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be

20   very little, a job is in this category when it requires a good deal of walking or standing, or

21   when it involves sitting most of the time with some pushing and pulling of arm or leg

22   controls.  To be considered capable of performing a full or wide range of light work, [the

23   claimant] must have the ability to do substantially all of these activities.  If someone can

24   do light work, we determine that he or she can also do sedentary work, unless there are

25   additional limiting factors such as loss of fine dexterity or inability to sit for long periods

26   of time." 20 C.F.R. § 404.1567; 20 CFR § 419.967.

27          To determine a claimant's residual functional capacity based on all impairments,

28   including impairments that are not severe, an ALJ must consider all relevant medical

opinions and other evidence in the record; the claimant's testimony "in conjunction with the medical evidence;" and "the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Chaudhry v. Astrue*, 688 F.3d 661, 670 (9th Cir. 2012); *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006). "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [] symptoms, diagnosis and prognosis, what [the claimant] can still do despite impairment(s), and [the claimant's] physical or mental restrictions." 20 CFR § 404.1527(a)(2).

The opinions of treating and examining medical sources are afforded "more weight" than non-treating, non-examining sources, such as Dr. Pella. 20 CFR § 404.1527(c)&(e). SSA regulations require a treating physician's opinion to be given "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substance evidence" in the record. 20 CFR § 404.1527(c)(2). The opinions of a treating or examining physician, can only be rejected if the ALJ sets forth "specific and legitimate reasons that are supported by substantial evidence in the record." *Lester v. Chater*, 81 F.3d 821, 831 (9th Cir. 1995).

"The opinion of a non-examining physician cannot by itself constitute substantial evidence that justifies the rejection of the opinion of either an examining physician or a treating physician." *Id.* In other words, the opinion of a non-examining physician, such as Dr. Pella, is generally entitled to less weight. On the other hand, the ALJ must "evaluate every medical opinion" received "[r]egardless of its source." 20 CFR § 404.1527(c). *See also* 20 CFR § 404.1545(a)(3). In assessing a claimant's residual functional capacity, the ALJ "must always consider and address medical source opinions" and explain why an opinion was not adopted. SSR 96-8P (S.S.A. July 2, 1996).

"Generally, the more consistent an opinion is with the record as a whole, the more weight [the ALJ] will give to that opinion." 20 CFR § 404.1527(c)(4). In addition, an

1   ALJ will "generally give more weight to the opinion of a specialist about medical issues

2   related to his or her area of specialty than to the opinion of a source who is not a

3   specialist." 20 CFR § 404.1527(c). "[T]he final responsibility for deciding" the

4   claimant's residual functional capacity "is reserved to the Commissioner." 20 CFR

5   § 404.1527(d)(2).

6          In his Motion for Summary Judgment, plaintiff cites two main reasons why he

7   believes the ALJ did not provide sufficient reasons for rejecting the portion of Dr. Pella's

8   opinion indicating his functional capacity was reduced to sedentary based on an MRI in

9   August 2011. First, plaintiff argues that the ALJ "was plainly wrong for stating that the

10  record does not contain any evidence of decreased motor strength and sensation." [Doc.

11  No. 13-1, at p. 7.] In support of this argument, plaintiff cites minor notations made in a

12  December 14, 2012 Charting Report [Doc. No. 12-7, at pp. 192-193] and a January 9,

13  2013 Charting Report/Discharge Summary [Doc. No. 12-7, at pp. 190-191] from his

14  participation in a physical therapy program through Sharp Healthcare and a February 5,

15  2013 Consultation Form completed in connection with a neurology consultation by Dr.

16  Sheean at UC San Diego Healthcare System. [Doc. No. 12-7, at pp. 190, 192, 193.]

17  However, a review of these medical records as a whole indicate that any findings related

18  to decreased motor strength and sensation were mild and, without more, do not appear

19  serious enough to be considered outside the normal range of someone who, as the ALJ

20  acknowledged, does have "mild degenerative disc disease in the cervical spine, as well as

21  moderate findings in the lumbar spine at L4-L5 and L5-S1." [Doc. No. 12-2, at p. 45.]

22  As a result, the minor notations referenced by plaintiff do not in any way negate the

23  ALJ's ultimate conclusion that plaintiff does have pain but the pain is not severe enough

24  to be disabling.

25         Second, plaintiff also argues that, contrary to the statement made by the ALJ in

26  support of his rejection of Dr. Pella's opinion, his reported daily activities do not indicate

27  that he has the residual functional capacity to perform work light work or that he is

28  capable of anything greater than a sedentary level of exertion. [Doc. No. 13-1, at p. 8.]

1   According to plaintiff, his admitted activities do not "rise to the level of substantial
2   evidence." [Doc. No. 13-1, at p. 10.]  Standing alone, it is true that plaintiff's admitted
3   daily activities are not enough to constitute substantial evidence to support the ALJ's
4   residual functional capacity assessment. *See, e.g., Vertigan v. Halter*, 260 F.3d 1044,
5   1049-1050 (9th Cir. 2001) (indicating the ALJ erred in rejecting the claimant's subjective
6   complaints of pain and limitations based on her reported physical activities because they
7   only represented a "scintilla of evidence" that the claimant lacked credibility).  However,
8   in this case, plaintiff's admitted daily activities only represent one of a number of factors
9   that the ALJ actually considered to evaluate the extent of plaintiff's pain and limitations
10  from his heart and back conditions.  As discussed more fully below, when all of the
11  factors considered by the ALJ are added together, they are enough to constitute
12  substantial evidence of a residual functional capacity for light work.

13      While it is true that the ALJ could have provided better or more detailed reasons
14  for rejecting a portion of Dr. Pella's opinion, his failure to do so is not fatal to his
15  ultimate determination about plaintiff's residual functional capacity.  In addition to the
16  reasons discussed above, Dr. Pella's opinion is entitled to less weight than that of
17  plaintiff's treating and/or examining physicians.  As discussed more fully below, when
18  viewed as a whole, the ALJ's ultimate conclusion about plaintiff's residual functional
19  capacity is supported by substantial evidence in the record

20      **B.    *The ALJ's Residual Functional Capacity Assessment*.**

21      The final decision of the Commissioner must be affirmed if it is supported by
22  substantial evidence and if the Commissioner has applied the correct legal standards.
23  *Batson v. Comm'r of the Social Security Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).
24  Under the substantial evidence standard, the Commissioner's findings are upheld if
25  supported by inferences reasonably drawn from the record.  *Id.*  If there is evidence in the
26  record to support more than one rational interpretation, the District Court must defer to
27  the Commissioner's decision.  *Id.*  Substantial evidence means "such relevant evidence as
28  a reasonable mind might accept as adequate to support a conclusion."  *Osenbrock v.*

1 | *Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  "In determining whether the

2 | Commissioner's findings are supported by substantial evidence, we must consider the

3 | evidence as a whole, weighing both the evidence that supports and the evidence that

4 | detracts from the Commissioner's conclusion." *Smolen v. Chater*, 80 F.3d 1273, 1279

5 | (9th Cir. 1996).

6 |   "Pain of sufficient severity . . . may provide the basis for determining that a

7 | claimant is disabled." *Light v. Soc. Sec. Admin.*, 119 F.3d at 792.  "[A] claimant need not

8 | present clinical or diagnostic evidence to support the severity of his pain." *Id.*  In turn, an

9 | ALJ may not reject "excess pain testimony" based solely on a lack of objective medical

10 | support in the record. *Id.* at 792-793.

11 |   "In assessing the credibility of a claimant's testimony regarding subjective pain or

12 | the intensity of symptoms, the ALJ engages in a two-step analysis. [Citation omitted.]

13 | First, the ALJ must determine whether there is 'objective medical evidence of an

14 | underlying impairment which could reasonably be expected to produce the pain or other

15 | symptoms alleged.' [Citations omitted.]  If the claimant has presented such evidence, and

16 | there is no evidence of malingering, then the ALJ must give 'specific, clear and

17 | convincing reasons' in order to reject the claimant's testimony about the severity of the

18 | symptoms. [Citations omitted.]  At the same time, the ALJ is not 'required to believe

19 | every allegation of disabling pain, or else disability benefits would be available for the

20 | asking, a result plainly contrary to 42 U.S.C. § 423(d)(5)(A).' [Citation omitted.]  In

21 | evaluating the claimant's testimony, the ALJ may use 'ordinary techniques of credibility

22 | evaluation.' [Citation omitted.]   For instance, the ALJ may consider inconsistencies

23 | either in the claimant's testimony or between the testimony and the claimant's conduct,

24 | [such as] . . . 'whether the claimant engages in daily activities inconsistent with the

25 | alleged symptoms.' [Citation omitted.] While a claimant need not 'vegetate in a dark

26 | room' in order to be eligible for benefits, [citation omitted], the ALJ may discredit a

27 | claimant's testimony when the claimant reports participation in everyday activities

28 | indicating capacities that are transferable to a work setting. [Citation omitted.]  Even

1    where those activities suggest some difficulty functioning, they may be grounds for

2    discrediting the claimant's testimony to the extent that they contradict claims of a totally

3    debilitating impairment. [Citation omitted.]" *Molina v. Astrue*, 674 F.3d 1104, 1112-

4    1113 (9th Cir. 2012).

5         If the ALJ's decision and the record are viewed as a whole, it is this Court's view

6    that substantial evidence supports the ALJ's conclusion that plaintiff retains the residual

7    functional capacity to perform his past relevant "light" work as a license and/or

8    administrative clerk even though Dr. Pella testified that plaintiff's level of exertion was

9    reduced to sedentary based on the results of an MRI from August 2011. The ALJ's

10   decision in this regard is based in large part on medical notes and reports by plaintiff's

11   treating and examining physicians and those of NP Yung which were made close in time

12   to the August 2011 MRI, and more recent records from 2012 and 2013. The ALJ's

13   conclusion about plaintiff's residual functional capacity is also based in part on plaintiff's

14   credibility, and the ALJ provided a number of reasons for his conclusion that plaintiff's

15   "allegations of disabling pain [were] out of proportion with the record." [Doc. No. 12-2,

16   at p. 45.]

17        First, the ALJ acknowledged that plaintiff has "mild degenerative disc disease in

18   the cervical spine," as well as moderate findings in the lumbar spine at L4-L5 and L5-S1.

19   [Doc. No. 12-2, at p. 45.] The ALJ also acknowledged that plaintiff has "radicular pain

20   at the level of L4 to S1," and, as a result, should be "limited to lighter lifting in order to

21   avoid exacerbations of back pain." [Doc. No. 12-2, at p. 46.] However, the ALJ said

22   plaintiff had "few objective findings of the lower extremities consistent with

23   radiculopathy." [Doc. No. 12-2, at p. 45.]

24        Specifically, the ALJ cited a consultative examination by Dr. Cava on August 13,

25   2011, shortly before the MRI was completed on August 30, 2011. [Doc. No. 12-2, at p.

26   45; Doc. No. 12-7, at pp. 121-122.] The ALJ's decision notes that Dr. Cava reported as

27   follows: "[T]he claimant was noted to have no trouble with sitting, standing, or walking.

28   There was only 'mild' right paralumbar tenderness to palpation without significant spinal

tenderness. Additionally, he had full range of motion of the lumbar spine, without spasm." [Doc. No. 12-2, at p. 45.] In addition, as noted above, Dr. Cava further stated that plaintiff could still walk several blocks before he needed to rest and did not have any problems with squatting, kneeling, or crouching. [Doc. No. 12-7, at pp. 86-88.] As a result of his examination, Dr. Cava concluded that plaintiff could stand, walk, and sit for six hours in an eight-hour day; lift and carry 25 pounds frequently and 50 pounds occasionally; and had no limitations for stooping, crouching, reaching and handling." [Doc. No. 12-7, at p. 88.] However, the ALJ gave this portion of Dr. Cava's report "little weight" because later medical records (*i.e.*, the August 30, 2011 MRI) indicated that plaintiff should be limited to lighter lifting than that recommended by Dr. Cava in order to avoid exacerbating his back pain. [Doc. No. 12-2, at p. 46; Doc. No. 12-7, at p. 121.] Although plaintiff attacks the ALJ's reliance on Dr. Cava's report and the reports of other medical professionals, his arguments are largely speculative and unconvincing based on a review of the record. [Doc. No. 20, at pp. 4-6.]

Second, citing progress notes from plaintiff's visits with his primary medical provider during 2011 and 2012, the ALJ stated that he had "not demonstrated signs of symptoms of severe spinal nerve root impingement (such as asymmetric reflexes, sensory or motor loss, or a positive straight leg raising sign)" during his visits with his treating physicians. [Doc. No. 12-2, at p. 45.] In December 2012, physical examination findings were "very soft" for objective signs of radiculopathy. Plaintiff had normal movements in all extremities, his gait was stable and narrow but slow, stiff and careful. [Doc. No. 12-2, at p. 45.]

Third, the ALJ cited conservative treatment evidence in the record. Based on his testimony during the hearing, plaintiff was taking only one Vicodin tablet for pain in the morning and was otherwise using Naprosyn for pain. [Doc. No. 12-2, at p. 45, citing Doc. No. 12-2, at pp. 71-72.] In addition to these medications, plaintiff was referred to physical therapy. [Doc. No. 12-2, at p. 45. *See also* Doc. No. 12-7, at p. 190 (stating that plaintiff was discharged from physical therapy on January 9, 2013, because his strength

1  and pain had improved and he could walk for 30 minutes without difficulty but still

2  complained about fatigue and calf cramping with prolonged walking).]  Plaintiff has not

3  required increasing doses or stronger medications and has not had referrals for epidural

4  injections, acupuncture, a TENS unit, or pain patches.  Surgery has not been

5  recommended and plaintiff was told that he was not a surgical candidate.  The ALJ

6  reasonably concluded from this evidence that plaintiff has "fair control" of his pain with a

7  moderate amount of medication.  [Doc. No. 12-2, at p. 45.]  Although not specifically

8  cited by the ALJ, Progress Notes from a follow up appointment with NP Yung on

9  February 27, 2013 further state that plaintiff's lower back pain was "well-controlled with

10 Vicodin" and that plaintiff did not want to go to the pain clinic because "his pain is

11 controlled with oral medications."  [Doc. No. 12-7, at p. 207.]

12      Fourth, it was the ALJ's view that plaintiff described daily activities that were not

13 consistent with disabling pain.  He was able to cook, do laundry, empty the trash, and

14 make minor household repairs.  [Doc. No. 12-2, at p. 45.]  The record also indicated he

15 walked the dogs, shopped, and dusted.  [Doc. No. 12-2, at p. 46.]  On March 31, 2012,

16 plaintiff told his cardiologist he was walking 20 minutes, six days per week for exercise,

17 and the cardiologist encouraged him to walk even longer, stop smoking, and follow a

18 restricted diet.  [Doc. No. 12-2, at p. 45.]

19      Finally, the ALJ gave "some weight" to the opinion of Dr. Vu, a non-examining

20 state agency medical consultant who reviewed plaintiff's medical records and prepared a

21 Case Analysis dated January 25, 2012.  [Doc. No. 12-2, at p. 46; Doc. No. 12-7, at

22 pp. 177-178.]  In the ALJ's view, Dr. Vu's analysis was entitled to some weight even

23 though he was not a treating or examining physician, because his opinions were timely

24 and consistent with the record as a whole.  Essentially, Dr. Vu concluded that plaintiff

25 was capable of light work, because he could lift and carry 10 pounds frequently and 20

26 pounds occasionally, stand and walk up to 6 hours out of an 8-hour day, and sit up to 6

27 hours out of an 8-hour day.  [Doc. No. 12-2, at p. 46; Doc. No. 12-7, at pp. 177-178.]

28      In sum, substantial evidence in the record supports the ALJ's conclusion that

15cv669-BEN(KSC)

1   plaintiff does not qualify for disability benefits, because he retains the residual functional

2   capacity for light work and is therefore capable of performing his past relevant work as a

3   license or administrative clerk.  In reaching this conclusion, the ALJ relied on substantial

4   evidence in the record; did not inappropriately reject a portion of the medical opinion by

5   Dr. Pella, the testifying medical expert; and provided clear, convincing, and specific

6   reasons for rejecting plaintiff's testimony indicating that he cannot work because he

7   suffers from severe, disabling pain in excess of that indicated by objective medical

8   evidence.

9       *C.*    ***The ALJ's Alternative Residual Functional Capacity Finding.***

10         As noted above, plaintiff also challenges the ALJ's alternative finding that he

11   would not be disabled even if full credit was given to Dr. Pella's opinion that his

12   functional capacity was reduced to sedentary in August 2011.  In this regard, the ALJ

13   concluded plaintiff could still return to his past relevant work as a real estate clerk,

14   because this position was classified as sedentary, skilled work.  Generally, if a claimant

15   can do light work, he or she can also do sedentary work, "unless there are additional

16   limiting factors such as loss of fine dexterity or inability to sit for long periods of time."

17   20 C.F.R. § 404.1567; 20 CFR § 419.967.  Plaintiff believes the ALJ's alternative

18   conclusion is incorrect, because the vocational expert mischaracterized his prior work as

19   a real estate clerk as a sedentary, skilled position.  If Dr. Pella's opinion was given full

20   credit, plaintiff argues that the ALJ could only find him disabled.  [Doc. No. 13-1, at pp.

21   3-11.]

22         As plaintiff contends, it does appear from the record that the vocational expert may

23   have mischaracterized his prior work as an office clerk in a real estate office as both

24   sedentary and skilled.  In a Work History form plaintiff completed on or about May 23,

25   2011, plaintiff stated he worked as an office clerk in a real estate office doing data entry,

26   copying, mailing, and delivering paperwork to his supervisors.  [Doc. No. 12-6, at pp. 38,

27   40.]

28         Based on the definitions provided in plaintiff's moving papers from the Dictionary

15cv669-BEN(KSC)

1  of Occupational Titles, the vocational expert may have confused plaintiff's former

2  position of office clerk in a real estate office performing basic clerical duties with the

3  skilled, sedentary job of "real estate clerk." [Doc. No. 13-1, at pp. 4-5.] However, if the

4  ALJ's alternative finding is error, it is harmless because the ALJ's finding that plaintiff

5  retains the residual functional capacity for light work is supported by substantial

6  evidence. *See, e.g., Tommasetti v. Astrue*, 533 F.3d 1035, 1042-1043 (9th Cir. 2008)

7  (holding that an error is harmless if it is inconsequential to the ultimate disability

8  determination). Under the circumstances presented, reversal or remand for additional

9  administrative proceedings on this issue is unnecessary. *See, e.g., Ludwig v. Astrue*, 681

10  F.3d 1047, 1055 (9th Cir. 2012) (indicating that a remand is unnecessary unless the

11  claimant is able to establish a "substantial likelihood of prejudice").

12  **VI.   *Conclusion*.**

13       Based on the foregoing, this Court concludes that substantial evidence in the

14  Administrative Record supports the ALJ's May 14, 2013 decision that plaintiff does not

15  qualify for disability or supplemental security income benefits because he retains the

16  residual functional capacity to perform his past relevant work as a license or

17  administrative clerk, both of which are considered semi-skilled, light work under SSA

18  regulations.

19       IT IS THEREFORE RECOMMENDED THAT THE DISTRICT COURT:

20       1.    DENY plaintiff's Motion for Summary Judgment [Doc. No. 13]; and

21       2.    GRANT defendant's Cross-Motion for Summary Judgment [Doc. No. 18].

22       This Report and Recommendation is submitted to the United States District Judge

23  assigned to this case, pursuant to the provisions of 28 U.S.C. § 636(b)(1) and Civil Local

24  Rule 72.1(d). Within fourteen (14) days after being served with a copy of this Report and

25  Recommendation, "any party may serve and file written objections." 28 U.S.C. §

26  636(b)(1)(B)&(C). The document should be captioned "Objections to Report and

27  Recommendation." The parties are advised that failure to file objections within this

28  / / /

1    ///

2    specific time may waive the right to raise those objections on appeal of the Court's order.

3    *Martinez v. Ylst*, 951 F.2d 1153, 1156–57 (9th Cir.1991).

4            IT IS SO ORDERED.

5    Dated:  July 28, 2016

6                                              _____

7                                              Hon. Karen S. Crawford
                                               United States Magistrate Judge

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

15cv669-BEN(KSC)